Cite as 2017 Ark. App. 61

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CR–16–397

| | |
|---|---|
| ANTHONY LEE GORDIN | Opinion Delivered FEBRUARY 1, 2017 |
| APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, FIRST DIVISION [NO. 60CR-13-3922] |
| V. | |
| STATE OF ARKANSAS | HONORABLE LEON JOHNSON, JUDGE |
| APPELLEE | AFFIRMED |

## DAVID M. GLOVER, Judge

Appellant Anthony Gordin was convicted in the Pulaski County Circuit Court of possession of a controlled substance (marijuana) with intent to deliver and placed on probation for a period of three years. Gordin's sole argument on appeal is that the trial court erred in denying his motion to suppress the statement he made when asked what a parcel delivered to him by a postal inspector contained. We affirm the denial of Gordin's motion to suppress.

Extensive testimony by two law-enforcement officers was presented at trial. Mickey Schuetzle, an inspector for the United States Postal Inspection Service, testified as follows. His job entailed working narcotics cases originating in the mail stream. On October 24, 2013, a package from Chino, California, was to be delivered to Gordin in North Little Rock at Quality Inn Suites. Schuetzle profiled the package and discovered the return address did not exist. He then enlisted the assistance of Investigator James Neeley with the North Little

Rock Police Department's narcotics unit in an attempt to make delivery of the package to Gordin. Working undercover, Schuetzle acted as if he were a postal supervisor out on a route delivering express mail pieces that had arrived late at the post office. The desk clerk at Quality Inn Suites advised him Gordin was living there; however, there was no answer either when the clerk called Gordin or when housekeeping knocked on his door. Schuetzle left his phone number at the clerk's desk, and approximately thirty minutes later, he received a call from a man identifying himself as Gordin. Schuetzle told Gordin he would bring the mail to the hotel as soon as he could and would call when he arrived.

When Schuetzle returned to the hotel, Neeley was already inside the lobby for officer–safety reasons. Schuetzle called Gordin to let him know he was "on his way" and advised Gordin he would need to present some type of identification so that Schuetzle could verify his identity. Gordin came down to the lobby, showed Schuetzle his passport, and signed for the package. After Gordin signed for the package, Schuetzle presented his postal-inspection credentials, advised Gordin he was a federal agent with the United States Postal Inspection Service, and stated he needed to visit with him about the package. Neeley came up and identified himself as well. Schuetzle asked Gordin if there was anything inside the parcel that could hurt anyone. In response, Gordin advised Schuetzle and Neeley the parcel contained marijuana. Schuetzle then asked for consent to open the parcel but Gordin refused, stating he did not feel comfortable doing so without his attorney present. Gordin was detained and transported to the North Little Rock Detective Division. A search warrant was executed for the parcel, which contained marijuana.

Schuetzle further testified express mail is one of the most common ways used to transport illegal narcotics because it is time sensitive, usually overnight. Gordin's three-pound parcel cost $49.45 to be delivered overnight. Until delivered, a piece of mail is considered to be "live mail" and requires a federal search warrant to be opened. This procedure takes more time than obtaining a state warrant. Therefore, a lot of investigations are handled as "knock and talks," because if the parcel is late, it sends a red flag to the person receiving it. Once a package has been delivered, it is no longer "live mail," and a state search warrant can be issued for the package. Schuetzle offered other factors he considered when investigating illegal narcotics sent through the mail: whether the parcel was mailed at a post office near the return address; whether there was a waiver of signature for receipt of the package, even though the sender has spent $50 sending the parcel; and whether the return address is valid. As Schuetzle explained, while he was suspicious of the package because of the indicators he had discovered, he had no reason to know what was actually in the package because he had not opened it or utilized a drug dog. By his explanation, he has been in situations where he has asked people if there was anything dangerous in the package, and they have told him there was nothing wrong with the contents of the package. In such situations, he has two options—either let the person go, or advise him that he is free to leave, but the package was going to be seized. Schuetzle offered the reasoning that if Gordin had stated there was nothing harmful in the package, he would have been free to go because there would be no reason to detain him; a state search warrant would be obtained and executed on the package; and if there was nothing illegal in the package, it would have been returned to Gordin.

SLIP OPINION

Schuetzle continued that Gordin was not in custody before he asked him what was in the package, and had Gordin taken the package and walked away, Schuetzle probably would have recovered the package because he had reason to believe something illegal was in the package, but Gordin would not have been detained because it was unknown what was in the parcel and thus gave no basis to hold Gordin.

On cross-examination, Schuetzle testified that the "bogus" address from California raised his suspicion about the contents of the parcel, precipitating the fake delivery to have Gordin accept the package. According to Schuetzle, as Gordin started to leave after he had signed for the package, Schuetzle told Gordin to wait, that he needed to talk to him. Schuetzle agreed with Gordin's counsel—at that time, Gordin was not free to leave anymore. And it was at that time Schuetzle specifically asked Gordin if there was anything in the package, knowing that if he said marijuana, it would be an incriminating statement. Schuetzle explained that, if he asks, sometimes it leads to consent to search the parcel, which is easier than having to obtain a warrant. Until Gordin said there was something in the box, he did not know if there was anything illegal in the box. He did not have probable cause to obtain a warrant. However, after Gordin stated there was marijuana in the package, Schuetzle then had the probable cause he needed to obtain a search warrant. Schuetzle admitted he had not read Gordin his *Miranda* rights when he asked Gordin about the contents of the box; however, he stated that Gordin was not required to answer his question and tell him what the box contained.

SLIP OPINION

Next, Investigator Neeley offered the following testimony. For Schuetzle's safety, he was present and in close proximity at the hotel for the package delivery. He watched Gordin come to the lobby, Schuetzle make contact with Gordin, Gordin present identification to Schuetzle, Gordin sign for the package, and Schuetzle present his credentials to Gordin. He stepped closer to them after Schuetzle presented his credentials because he knew Schuetzle was about to ask Gordin for consent to open the package. He had a consent-to-search form with him. He had no idea what the package contained, but he heard Schuetzle ask about the contents of the package. He heard Gordin's answer. Gordin was not in custody. After Gordin told both officers the package contained marijuana, Schuetzle asked for consent to open the package. When Gordin refused consent, he was not free to leave because he had told them the package contained marijuana, an illegal controlled substance. Neeley stated Gordin was not walking away when Schuetzle asked about the contents of the package.

Felisia Lackey, the chief forensic drug chemist at the Arkansas State Crime Lab, testified she determined the substance in the package was marijuana. She stated there were five separate bags of marijuana with a total gross weight of 1,053.9 grams.

In arguing to the trial court that his statement about the contents of the package should be suppressed, Gordin pointed to Schuetzle's testimony that Gordin was not free to leave after signing for the package because Schuetzle wanted to ask him a question and the fact Gordin had not been advised of his *Miranda* rights prior to answering Schuetzle's question. Although Neeley testified Gordin was free to leave until he told the officers the package contained marijuana, Gordin contended Schuetzle's testimony was more credible. The State countered

SLIP OPINION

this argument as follows. There was nothing wrong with officers asking questions to any person willing to answer them, so long as it was not in a custodial fashion and did not rise to the level of a seizure. The State pointed out: Schuetzle presented Gordin with the package in the open lobby of a hotel; Gordin accepted the package; Gordin was presented with agent credentials; and Gordin was asked about the contents of the package. The State argued law-enforcement officers are allowed to ask for cooperation, and it was Gordin's answer, not the asking of the question, that "snowballed" the case. The trial court denied Gordin's motion to suppress.

On appeal, Gordin argues the trial court erred in denying his motion to suppress the statement he made to Schuetzle because he was not free to leave when Schuetzle asked him if there was anything in the package that would be dangerous to anyone, and Schuetzle did not advise him of his *Miranda* rights. In reviewing a circuit court's denial of a motion to suppress evidence, we conduct a de novo review based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the circuit court and proper deference to the circuit court's findings. *Duke v. State*, 2016 Ark. App. 402. We reverse the circuit court's ruling only if it is clearly against the preponderance of the evidence, giving deference to the circuit court's credibility and weight-of-the-evidence determinations. *Fowler v. State*, 2015 Ark. App. 232, 459 S.W.3d 837.

*Miranda* safeguards are applicable as soon as a suspect's freedom is curtailed to a degree associated with a formal arrest; a person is "in custody" for purposes of *Miranda* warnings

when deprived of freedom by formal arrest or the restraint on freedom of movement of the degree associated with a formal arrest. *Id.* In determining whether a person was "in custody" at a particular time, the relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation. *Id.*

Rule 2.2 of the Arkansas Rules of Criminal Procedure provides:

(a) A law enforcement officer may request any person to furnish information or otherwise cooperate in the investigation or prevention of crime. The officer may request the person to respond to questions, to appear at a police station, or to comply with any other reasonable request.

(b) In making a request pursuant to this rule, no law enforcement officer shall indicate that a person is legally obligated to furnish information or to otherwise cooperate if no such legal obligation exists. Compliance with the request for information or other cooperation hereunder shall not be regarded as involuntary or coerced solely on the ground that such a request was made by a law enforcement officer.

We affirm the trial court's denial of Gordin's motion to suppress based on Rule 2.2. At the time Gordin answered Schuetzle's question regarding what the delivered package contained, Gordin was not under formal arrest; neither was his freedom of movement restrained to the extent of a formal arrest. Although Schuetzle did make the statement Gordin was not free to leave, Neeley testified Gordin was free to leave and not answer the question. It was only when Gordin told them it was marijuana that he was no longer free to leave. Gordin argues our court cannot consider Neeley's testimony over Schuetzle's testimony; this in incorrect. We give deference to the circuit court's credibility and weight-of-the-evidence determinations. *Fowler, supra.*

In support of his argument that his statement should be suppressed, Gordin cites *Fowler v. State*, 2010 Ark. App. 23. That opinion was vacated by our supreme court in *Fowler v.*

*State*, 2010 Ark. 431, 371 S.W.3d 677. However, our supreme court's holding in that case supports affirming the present case. Fowler was observed around 7:25 a.m. walking through a backyard on private property behind a house. Officers patrolling nearby were concerned he might be truant or had broken into a house. They drove closer to Fowler and asked his name. Fowler began to approach but then blurted out some words and ran off. The officers pursued Fowler, who was eventually apprehended and placed under arrest for fleeing and obstruction of justice, both misdemeanors. After his arrest, it was learned Fowler was on parole. At the request of his parole officers, the police officers held Fowler and interrogated him, during which Fowler admitted he had items in his home that violated the terms of his parole.

Our supreme court held the initial encounter with Fowler (where the officers asked him his name) was constitutionally allowed under Rule 2.2, noting that the officers could certainly approach people in public and ask if they are willing to answer some questions. At the first encounter, Fowler was free to ignore the police and leave, but instead he blurted out some words and ran away when the officers requested his name. Our supreme court further held that the unintelligible response, coupled with running immediately after, constituted the reasonable suspicion required to justify the pursuit and the second stop of Fowler, because when police officers have reasonable suspicion a person may be involved in criminal activity, they may stop the person and briefly investigate further; however, if facts do not rise to the level of probable cause, the individual must be allowed to go on his way. In *Fowler*, no brief investigation was made after the second stop; instead, Fowler was arrested. Our supreme

SLIP OPINION

court held that the arrest, rather than a brief investigation to determine if probable cause existed, transformed the second stop into an illegal seizure.

It is unnecessary to analyze the instant case with regard to the second stop in *Fowler*, as the facts of the case before us do not go that far—it is analogous to the first stop in *Fowler*, where the officers merely asked Fowler a question, which our supreme court held was appropriate under Rule 2.2. Here, Schuetzle simply asked Gordin a question. It was only after Gordin informed him there was marijuana in the package that Gordin was no longer free to leave. Gordin was not required to answer the question. He could have ignored Schuetzle and walked away. However, he answered the question, and his answer transformed the situation into one where he was not free to leave.

Affirmed.

ABRAMSON and MURPHY, JJ., agree.

*Montgomery, Adams & Wyatt, PLC*, by: *James W. Wyatt*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Karen Virginia Wallace*, Ass't Att'y Gen., for appellee.